UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| TONYA H.,[1]<br><br>               Plaintiff,<br><br>   vs.<br><br>ANDREW M. SAUL, Commissioner,<br>Social Security Administration,<br><br>              Defendant. | CIV. 20-5008-JLV<br><br><br>REDACTED ORDER |

## INTRODUCTION

Plaintiff filed a complaint appealing the final decision of Andrew M. Saul, Commissioner of the Social Security Administration, finding her not disabled. (Docket 1). Defendant denies plaintiff is entitled to benefits. (Docket 5). The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF"). (Docket 7). The parties filed their JSMF. (Docket 9). For the reasons stated below, plaintiff's motion to reverse the decision of the Commissioner (Docket 16) is granted and defendant's motion to affirm the decision of the Commissioner (Docket 19) is denied.

---

[1]The Administrative Office of the Judiciary suggested the court be more mindful of protecting from public access the private information in Social Security opinions and orders. For that reason, the Western Division of the District of South Dakota will use the first name and last initial of every non-governmental person, except physicians and other professionals, mentioned in the opinion. This includes the names of non-governmental parties appearing in case captions.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 9) is incorporated by reference.  Further recitation of salient facts is incorporated in the discussion section of this order. On March 17, 2016, plaintiff applied for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-33 and 1381-83f, respectively.  (Docket 9 ¶ 1). She alleged an onset of disability date of May 15, 2015.  Id.  On December 5, 2018, an ALJ issued a decision finding plaintiff not disabled from May 15, 2015, through the date of the ALJ's decision.  Id. ¶ 8; see also Administrative Record ("AR") at pp. 16-34.  Plaintiff sought review from the Appeals Council of the ALJ's decision in February 2019.  (Docket 9 ¶ 9).  On January 16, 2020, the Appeals Council denied plaintiff's request for review.  Id. ¶ 10.  The ALJ's December 5, 2018, decision constitutes the final decision of the Commissioner of the Social Security Administration.  It is from this decision which plaintiff timely appeals.

The issue before the court is whether the ALJ's decision plaintiff was not "under a disability, as defined in the Social Security Act, from May 15, 2015, through [December 5, 2018]" is supported by substantial evidence in the record as a whole.  (AR at p. 29) (bold omitted); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); <u>Choate v. Barnhart</u>, 457 F.3d 865, 869 (8th Cir. 2006); <u>Howard</u>, 255 F.3d at 580.  The court reviews the Commissioner's decision to determine if an error of law was committed.  <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."  <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005) (quoting <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence.  <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005).  A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "  <u>Reed</u>, 399 F.3d at 920 (quoting <u>Shannon v. Chater</u>, 54 F.3d 484,

3

486 (8th Cir. 1995)).  Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act.  See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to disability insurance benefits under Title II or supplemental security income under Title XVI.  20 CFR § 404.1520(a) and 416.920(a).[2]  If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.  Id.  The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment— one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).  The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.  (AR at pp. 20-29).

_____

[2]The criteria under 20 CFR § 416.920 are the same as those under 20 CFR § 404.1520.  Boyd v. Sullivan, 960 F.2d 733, 735 (8th Cir. 1992).  All further references will be to the regulations governing disability insurance benefits, unless otherwise specifically indicated.

## STEP ONE

At step one, the ALJ determined plaintiff "has not engaged in substantial gainful activity since May 15, 2015, the . . . alleged onset [of disability]." Id. at p. 22 (bold omitted).

## STEP TWO

At step two, the ALJ must decide whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe.  20 CFR § 404.1520(c).  A medically determinable impairment can only be established by an acceptable medical source.  20 CFR § 404.1513(a). Accepted medical sources include, among others, licensed physicians.  Id.  "It is the claimant's burden to establish that his impairment or combination of impairments are severe."  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).

The regulations describe "severe impairment" in the negative.  "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 CFR § 404.1521(a).  An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  Kirby, 500 F.3d at 707. Thus, a severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activities.  A severe impairment or combination of impairments must meet the regulations' duration requirement that the impairment(s) are "expected to result in death" or otherwise "must

have lasted or must be expected to last for a continuous period of at least 12 months."  20 CFR § 404.1509.

The ALJ identified plaintiff suffered from the following severe impairments: "[spasmodic] dysphonia and lumbar degenerative disc disease." (AR at p. 22) (bold omitted).  Plaintiff does not challenge this finding.  (Docket 16).

### STEP THREE

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 404.1520(d), 404.1525 and 404.1526.  If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled.  At that point the Commissioner "acknowledges [the impairment or combination of impairments] are so severe as to preclude substantial gainful activity. . . . [and] the claimant is conclusively presumed to be disabled."  Bowen v. Yuckert, 482 U.S. 137, 141 (1987).  Plaintiff has the burden of proof that her impairment meets or equals the severity of one of the listed impairments.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

The ALJ determined plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in" Appendix 1.  (AR at p. 23) (bold omitted).  Listing

6

1.04 establishes a claimant's spinal disorder such as degenerative disc disease is of the requisite severity to deem the claimant presumptively disabled if the claimant's disorder "result[s] in compromise of a nerve root . . . or the spinal cord," and where there is:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis . . . ; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively . . . .

Appendix 1, Listing 1.04(A)-(C).  The ALJ concluded with regard to plaintiff's degenerative disc disease of the lumbar spine that "the evidence does not satisfy the criteria of [Listing] 1.04" because "the record is devoid of evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis with accompanying ineffective ambulation."  (AR at p. 24).

Listing 2.09 deems a claimant who suffers from a loss of speech "due to any cause" presumptively disabled where the claimant has an "inability to produce by any means speech that can be heard, understood, or sustained." Appendix 1, Listing 2.09.  The ALJ evaluated plaintiff's spasmodic dysphonia under Listing 2.09 and concluded plaintiff's condition does not meet the listing's criteria because plaintiff's "voice is low and soft, but can clearly be

heard and understood, as demonstrated in the audio recording of the hearing."
(AR at p. 24).  Plaintiff does not challenge either of these findings.  (Docket 16).

### STEP FOUR

At the outset of step four, the ALJ must determine a claimant's residual
functional capacity (RFC).  20 CFR § 404.1520(e).  A claimant's "impairment(s),
and any related symptoms, such as pain, may cause physical and mental
limitations that affect what [the claimant] can do in a work setting."  Id.
§ 404.1545(a)(1).  An RFC assessment is the ALJ's determination of "the most
[they] can still do despite [their] limitations."  Id.  In assessing RFC, the ALJ
considers "the total limiting effects" of a claimant's impairment(s)—i.e., all of a
claimant's medically determinable impairments, even those that are not severe,
and their resulting symptoms and limitations on the claimant's physical,
mental and sensory abilities.  Id. §§ 404.1545(e), 404.1545(b)-(d).  The ALJ
must consider all relevant medical and non-medical evidence in the record.
20 CFR §§ 404.1520(e) and 404.1545; see also Lacroix v. Barnhart, 465 F.3d
881, 887 (8th Cir. 2006) ("The ALJ should determine a claimant's RFC based
on all the relevant evidence, including the medical records, observations of
treating physicians and others, and an individual's own description of [her]
limitations." (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir.
2004))).

The ALJ uses the RFC assessment at step four to decide whether a
claimant can perform their "past relevant work."  20 CFR § 404.1545(a)(5)(i).  If
the ALJ finds the claimant can perform their past relevant work, the claimant

is not disabled, as defined under the Social Security Act.  If the ALJ finds a claimant cannot perform their past relevant work, the ALJ proceeds to step five.

The ALJ found plaintiff has the RFC to perform light work.  (AR at p. 24).

Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. . . .

20 CFR § 404.1567(b).  Specifically, the ALJ found plaintiff can

> lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently.  She can walk and/or stand about 6 hours per 8-hour workday and sit about 6 hours per 8-hour workday.  She can periodically alternate between sitting and standing every 30-60 minutes for a few minutes at one time while staying on task.  She can occasionally stoop, kneel, crouch, crawl, and climb ladders/ropes/scaffolds/ramps/stairs.  She can frequently balance. She must avoid concentrated exposure to extreme cold, fumes, odors, gases, dust, poor ventilation, and hazards such as unprotected heights and dangerous machinery.  She can perform work allowing her to communicate with others while speaking in a whisper.

(AR at p. 24) (bold omitted).  Based on the assessment plaintiff has the RFC to perform light work, the ALJ determined plaintiff "is capable of performing past relevant work as an assistant manager and cashier."  (AR at p. 27) (bold omitted).  Therefore, the ALJ concluded plaintiff "has not been under a disability, as defined in the Social Security Act, from May 15, 2015, through

the date of [the ALJ's] decision," December 5, 2018.  (AR at p. 29) (bold

omitted).

Plaintiff challenges the ALJ's assessment of her RFC.  (Docket 16).  She

alleges the ALJ:

(1) Improperly rejected the medical opinions of treating physician Dr.

Brett L. concerning plaintiff's pain symptoms and appropriate work

restrictions;

(2) Improperly evaluated plaintiff's testimony concerning her pain

symptoms; and

(3) Improperly evaluated plaintiff's husband's testimony concerning the

same.

See id. at p. 1.[3]

**A. Medical Opinions of Dr. L.**

Medical opinions are "statements from acceptable medical sources that

reflect judgments about the nature and severity of [a claimant's] impairment(s),

including [their] symptoms, diagnosis and prognosis, what [they] can still do

---

[3]In March of 2016, the Social Security Administration ("SSA") adopted a
new policy interpreting its Title II and XVI regulations in which it "eliminat[ed]
the use of the term 'credibility' from [its] sub-regulatory policy, as [its]
regulations do not use this term."  SSR 16-3p: Titles II and XVI: Evaluation of
Symptoms in Disability Claims ("SSR 16-3p").  Instead, the SSA "instruct[s] [its]
adjudicators to consider all of the evidence in an individual's record when they
evaluate the intensity and persistence of symptoms," including both objective
medical evidence and subjective accounts of an individual's pain.  See id.
Plaintiff frames her second and third objections in terms of whether the ALJ
properly evaluated plaintiff's and plaintiff's husband's credibility, and she
primarily cites case law pre-dating SSR 16-3p in support of her argument.  See
Docket 16 at pp. 1, 12-14.  The court recasts her objections and analyzes them
in accordance with the framework announced in SSR 16-3p.

despite impairment(s), and [their] physical or mental restrictions."  20 CFR § 404.1527(a)(1).  The ALJ must evaluate every medical opinion in the record. Id. § 404.1527(c).  Generally, greater weight is given to medical opinions from examining medical professionals compared to non-examining ones.  Id. § 404.1527(c)(1).  Additionally, greater weight is given to opinions from treating sources—i.e., medical professionals who have an ongoing relationship with the claimant.  Id. § 404.1527(c)(2); see also Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence"). A treating source's opinion on the nature and severity of a claimant's impairment(s) is given controlling weight if the ALJ determines it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record."  Id. § 404.1527(c)(2); see also House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007).  However, "while entitled to special weight, it does not automatically control, particularly if the treating physician evidence is itself inconsistent."  House, 500 F.3d at 744.

If the ALJ does not give a treating source's medical opinions controlling weight, the ALJ must determine what weight to give those opinions based on enumerated factors, including: the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the medical opinion(s), the consistency of those opinions

with the record as a whole, and whether the treating source is a specialist in the areas of the opinions rendered.  See id. §§ 404.1527(c)(2)(i)-(ii) & (c)(3)-(5).

The ALJ accorded Dr. L.'s opinion "little weight" based on what she perceived were "inconsistencies" between Dr. L.'s earlier opinions rendered in 2015 and his later opinions rendered in 2016 and 2018.  (AR at p. 26).  She states his July "2018 opinion differs greatly from those he offered in 2015," and asserts the "inconsistencies were never explained, and there is no objective medical evidence to indicate [plaintiff's] lumbar condition worsened to justify [] additional limitations" imposed by Dr. L. over time.  Id.  Furthermore, she gave little weight to Dr. L.'s July 2018 opinion because it was "based . . . generally on that of [a] functional capacity evaluation" performed by physical therapist Phil B. the month prior, which she gave "minimal weight" because "the examination did not occur over an 8-hour period, and there were self-limiting behaviors reported by the claimant on 7 out of 21 tests," which the ALJ interpreted to mean plaintiff "may have not given full effort or been fully forthcoming regarding her limitations."  Id.

The ALJ also gave "minimal weight" to treating source Dr. Jay W.  (AR at p. 27).  Dr. W. had treated plaintiff for her spasmodic dysphonia for six and a half years and opined in a 2017 letter that her condition "permanently impairs [plaintiff's] ability to communicate properly" and "will affect her ability to find employment."  (Docket 9 ¶ 33).  However, the ALJ concluded the plaintiff "is capable of communicating while speaking at a whisper."  (AR at p. 27).  The ALJ further noted plaintiff "alleged her dysphonia had been present at

12

approximately the same level for about 12 years, and she did not stop working in May 2015 due to any difficulty with dysphonia," so the ALJ concluded "there is nothing to suggest the symptoms of dysphonia alone would currently prevent all work activity."  Id.

In contrast, the ALJ accorded "significant weight" to the opinion of non-treating source Dr. John Lassegard, who conducted a one-time consultative physical examination of plaintiff in October 2016, "because it was based on a thorough review of medical evidence in the record and an examination of the claimant."  Id. at pp. 25-26.  The ALJ characterizes Dr. Lassegard's examination as finding the plaintiff "was in no acute distress, and her gait was normal.  She used no assistive device to ambulate. . . . [S]he spoke only in a whisper."  Id. at pp. 25-26.  The ALJ concedes "Dr. Lassegard diagnosed chronic lower back pain due to degenerative disc disease, and he opined [plaintiff] was capable of sitting 8 hours per day, and she could walk/stand 4-6 hours per day with position changes every hour lasting 5-10 minutes.  He felt she could lift 20-25 pounds occasionally and 10 pounds frequently.  He felt she could occasionally stoop, climb, and kneel."  Id. at p. 26.  Nevertheless, the ALJ found "no objective basis for [plaintiff] to change positions as often or for as long as described by Dr. Lassegard or to limit walking to less than 6 hours per 8-hour workday or to limit exposure to pulmonary irritants" because those "limitations were based on [plaintiff's] subjective reports," which the ALJ stated "are not supported by Dr. Lassegard's examination."  Id. at p. 26.

The ALJ also accorded "significant weight" to the opinions of consultants Dr. Martin Rubinowitz and Dr. Gregory Erickson, both non-treating, non-examining sources.  Id. at p. 27.  Dr. Rubinowitz and Dr. Erickson formed their opinions based off their reviews of the "available medical record" in November 2016 and February 2017, respectively.  (Docket 9 ¶¶ 44-45).  The ALJ found their opinions "internally consistent and well supported by . . . the available evidence" and therefore "highly persuasive," even though she admitted "these experts did not have the same opportunity . . . to review the evidence submitted through the date of the hearing or to see and hear [plaintiff's] testimony."  (AR at p. 27).

Plaintiff challenges the ALJ's decision to give Dr. L.'s opinion little weight based on the ALJ's perception there were unexplained internal inconsistencies in Dr. L.'s opinion over time.  Plaintiff advances "three primary reasons for Dr. [L.'s] modified opinions over time," which she argues "provide support for Dr. [L.'s] greater work restrictions beginning on December 30, 2015."  (Docket 16 at p. 10).  First, plaintiff contends she "couldn't get the medical treatment Dr. [L.] recommended in October of 2015 until after her workers' compensation case was decided in 2017, causing a worsening of her condition."  Id.  Second, plaintiff contends Dr. L.'s "notes document increased pain and objective findings after her treatment was cut off."  Id.  Third, plaintiff asserts Dr. L's "opinion is buttressed by a functional capacities evaluation performed by physical therapist [Mr. B.] which limited [plaintiff] to part time work."  Id.

14

The Commissioner responds to each of plaintiff's three arguments. (Docket 20 at p. 11).  First, the Commissioner argues that plaintiff's contention her condition worsened because she was unable to get the treatment Dr. L. recommended while her worker's compensation claim was pending is "not supported by medical evidence, and it is undercut by the October 12, 2016, examination findings documented by consultative examiner Dr. Lassegard."  Id. Second, the Commissioner argues plaintiff's contention that "Dr. [L.'s] notes document increased pain and objective findings after her treatment was cut off," including "an extremely limited FABER test on the left" in October 2016 is "insufficient to support the dramatic change in limitations, in light of . . . Dr. [L.'s] March 12, 2015, exam, when Plaintiff was still working," which also noted a "markedly restricted" FABER test on the left.  Id.  Third, the Commissioner pushes back against plaintiff's contention that Dr. L.'s opinion is buttressed by the June 2018 functional capacity evaluation performed by physical therapist Mr. B, arguing "the ALJ properly accorded minimal weight to the opinion of the physical therapist, noting inconsistencies in Plaintiff's performance and self-limiting behavior on one-third . . . of the tasks."  Id.

Dr. L. first saw plaintiff on March 12, 2015, after she had recently sustained a left low back injury while working.  (Docket 9 ¶ 16).  Dr. L. distinguished her current injury from her long history of right low back pain. Id.  At that appointment, he noted "she had left low back and left leg pain varying" from a 3 out of 10 to a 10 out of 10.  Id.  Her gait was mildly antalgic, lumbar spine range of motion was limited in all directions, and she had

tenderness, some spasm and guarding in her left S1 and left L5-S1 facet areas. Id. Dr. L. performed a FABER test, noting plaintiff was "markedly restricted bilaterally, and that prone extension and reverse straight leg raising cause[d] [her] pain." Id. He recommended treatment including physical therapy with a manual therapist for mobilization, a neuromuscular electrical stimulation unit for home use, and he prescribed Naproxen and Norflex to manage her pain. Id. At this point, she was already taking hydrocodone for pain management, as well. Id. ¶¶ 14, 17.

Dr. L. next saw plaintiff on May 5, 2015, shortly after she experienced another work injury that exacerbated her left low back pain. Id. ¶ 18. Again, he determined she had an "antalgic gait and had pain with weight bearing on her left leg," a positive FABER test, pain with a straight leg raise test and tenderness around her S1 joint. Id. He again recommended physical therapy, and he refilled pain medications including Norflex, Hydrocodone and Tramadol. Id. On May 11, 2015, he released her to return to work with restrictions of "a maximum lift of 15 pounds and limiting her bending, twisting, kneeling, squatting to occasional and [changing] from sit to stand to walk every 30 minutes as necessary." Id.

The next several times Dr. L. saw plaintiff, he noted her continuing or worsening condition and recommended more aggressive treatment. On July 9, 2015, Dr. L. noted plaintiff had not improved much from physical therapy and was still experiencing pain in her left low back and pain and numbness down her left leg. Id. ¶ 20. He prescribed her Cataflam to replace hydrocodone and

16

"recommended proceeding with an epidural steroid injection." Id.  He performed the epidural steroid injection on July 21, 2015, but noted at a follow-up appointment on August 11, 2015, that unfortunately it had not given plaintiff sustained relief.  Id. ¶¶ 22, 24.  He noted she "continued to have predominately left sided low back pain" which caused her to be "quite incapacitated." Id. ¶ 24.  He again recommended more aggressive treatment to target her pain—this time a lumbar facet injection.  Id.  He also increased plaintiff's work restrictions around that time, limiting her to "lifting no more than 5 pounds, limiting her bending, twisting, squatting, and kneeling to occasional and changing from sitting, standing, and walking every 30 minutes, as necessary." Id. ¶ 25.

Dr. L. performed facet injections on August 27, 2015.  Id. ¶ 26.  On October 7, 2015, he noted they only gave her brief relief and that her pain continued.  Id. ¶ 27.  He again recommended more aggressive treatment—this time diagnostic medial branch block injections and, if those provided her relief, potentially surgery.  Id.  He continued her most recent work restrictions.  Id. ¶ 28.

Unfortunately, plaintiff was unable to pursue the more aggressive treatment recommended by Dr. L. while her worker's compensation claim was pending.  Id. ¶ 29.  Nevertheless, plaintiff saw Dr. L. again on December 30, 2015, and saw other providers in his pain management practice on March 17, 2016, and August 1, 2016.  Id. ¶¶ 29-31.  Notes from those appointments indicate her "symptoms [had] continue[d] to worsen." Id. ¶ 30.  She continued

17

experiencing "significant pain," which limited her physically, including making it difficult for her to stand, walk or engage in other activity for prolonged periods.  Id.  She continued to take pain medications including hydrocodone and Tramadol.  Id.

When Dr. L. next saw plaintiff on October 11, 2016, he noted "no change in her medical condition and if anything, her pain was a little worse.  He noted her pain was rated as high as a 10/10."  Id. ¶ 32.  She continued to exhibit a limited range of motion due to left low back pain and tenderness, spasms and guarding in that area, and her FABER test was "extremely limited."  Id.  Dr. L. recommended the medial branch block again, as well as radiofrequency ablation, another treatment used to provide relief from chronic low back pain.  Id.  However, pursuing these more aggressive measures was stymied again by plaintiff's pending worker's compensation claim.  Id.

Around that same time, Dr. L. testified at plaintiff's worker's compensation hearing.  Id. ¶ 48.  He testified he "did not believe she was malingering or overstating her complaints in way whatsoever."  Id. ¶ 55.  He expressed "a medical opinion to within a reasonable degree of medi[c]al probability that [plaintiff] needed to lie down for pain relief given her medical condition."  Id. ¶ 51.  He opined she had needed to do so since the end of 2015.  Id. ¶ 52.  Dr. L. subsequently reiterated his opinion she needed to lie down for pain relief and she was not overstating her pain complaints on multiple occasions, including in February 2018 and again in July 2018, and does not

18

appear at any time during that period to have given an opinion to the contrary. Id. ¶¶ 34, 36-37.

The record does not provide substantial evidence for the ALJ's determination there were internal inconsistencies in Dr. L.'s opinions over time. Dr. L. examined and treated plaintiff regularly over the course of several years, as did a couple of his colleagues on occasion. During this time, the records indicate plaintiff exhibited left low back pain and that Dr. L.'s opinion consistently attributed this pain to injuries she sustained early in 2015. He consistently notes her ongoing symptoms, such as pain and restricted range of motion, even at times noting they worsened. These observations are supported by diagnostic techniques performed over time, such as imaging and FABER tests, which indicated injury to plaintiff's left low back that could reasonably be expected to produce her symptoms. From 2015 through 2018, Dr. L. consistently pursued more aggressive treatment for plaintiff. He also periodically implemented greater work restrictions for plaintiff as time went on and her pain continued without any sustained relief. While he may not have formed an opinion on plaintiff's need to lie down to relieve her pain from the outset, the opinion he ultimately formed in this regard is consistent with the rest of his examination and treatment records of plaintiff, and since formulating the opinion he has consistently maintained it.

Nor are Dr. L.'s opinions inconsistent with the record as a whole. The ALJ gave substantial weight to a one-time examination of plaintiff by Dr. Lassegard in October 2016. In doing so, the ALJ emphasized Dr. Lassegard's

determination plaintiff "was in no acute distress [at the time], and her gait was normal," and downplayed his finding that, nevertheless, plaintiff reported low back pain, tenderness and muscle spasm, which resulted in self-limiting behaviors on some range of motion tests.  (AR at pp. 25-26).  Curiously, the ALJ even found "no objective basis" in Dr. Lassegard's examination for the restrictions Dr. Lassegard himself recommended based on that same examination.  Id.  To discount the opinion of a treating source, Dr. L., who examined plaintiff on numerous occasions over the course of years because it is not *entirely* consistent with a one-time consultative examination of plaintiff is not proper.  Similarly, to accord more significant weight to the opinions of two non-examining consultative doctors, Dr. Rubinowitz and Dr. Erickson, who never had the opportunity to review the entire record through 2018—an opportunity, notably, Dr. Lassegard also did not have—was not proper.

The court finds Dr. L.'s opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques.  The court further finds his opinions are not internally inconsistent, nor are they inconsistent with the other substantial evidence in the record.  Dr. L.'s opinions therefore merited controlling weight, and the ALJ erred by giving them only little weight.

**B. Plaintiff's Testimony**

A claimant's testimony about her symptoms, alone, is not determinative of disability status.  42 U.S.C. § 423(D)(5)(A); 20 CFR § 404.1529(a).  Evaluating symptoms such as pain is merely one component of the ALJ's responsibility to assess a claimant's RFC.  The ALJ must follow a two-step

process in evaluating a claimant's symptoms.  20 CFR § 404.1529; SSR 16-3p.

First, the ALJ must "determine whether the individual has a medically

determinable impairment . . . that could reasonably be expected to produce the

individual's alleged symptoms."  SSR 16-3p; 20 CFR § 404.1529(b).  Then the

ALJ must "evaluate the intensity and persistence of an individual's symptoms

such as pain and determine the extent to which an individual's symptoms limit

his or her ability to perform work-related activities . . . ."  SSR 16-3p; 20 CFR

§ 404.1529(c).

"In evaluating the intensity and persistence of [a claimant's] symptoms,

[the ALJ] consider[s] all of the available evidence from . . . medical sources and

nonmedical sources."  20 CFR § 404.1529(c)(1).  This includes evaluating the

claimant's own statements about the "intensity, persistence, and limiting

effects" of her pain.  Id. § 404.1529(c)(4).  The ALJ evaluates a claimant's

statements against the following factors:

> (1) the claimant's daily activities; (2) the duration, intensity, and
> frequency of pain; (3) the precipitating and aggravating factors;
> (4) the dosage, effectiveness, and side effects of medication; (5) any
> functional restrictions; (6) the claimant's work history; and (7) the
> absence of objective medical evidence to support the claimant's
> complaints.

Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (citing Polaski v. Heckler,

739 F.2d 1320, 1322 (8th Cir. 1984)).  "[An] ALJ need not explicitly discuss

each Polaski factor.  It is sufficient if he acknowledges and considers those

factors before discounting a claimant's subjective complaints."  Strongson v.

Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (citation omitted).

Ultimately, "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, we will defer to [the ALJ's] decision.  An ALJ may decline to credit a claimant's subjective complaints if the evidence as a whole is inconsistent with the claimant's testimony." <u>Julin v. Colvin</u>, 826 F.3d 1082, 1086 (8th Cir. 2016) (internal quotations and citations omitted). However, "an ALJ may not discount a claimant's allegations solely because the objective medical evidence does not fully support them[.]" <u>Bernard v. Colvin</u>, 774 F.3d 482, 488 (8th Cir. 2014) (internal quotation and alteration omitted).

The ALJ followed the two-step process and, having already found two medically determinable impairments that could reasonably be expected to produce plaintiff's pain and other symptoms, proceeded to the second step. (AR at pp. 24-25).  The ALJ acknowledged plaintiff "alleges an inability to perform work activity due to lower back pain that limits her ability to sit, stand, or walk for extended periods and further limits her ability to lift or carry heavier objects.  She also alleges an inability to communicate effectively with others because she can only speak in a whisper." <u>Id.</u> at pp. 24-25.  However, the ALJ determined plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." <u>Id.</u> at p. 25.

Plaintiff challenges the ALJ's determination, arguing the "ALJ did not reference [her] activities, her use of pain medications, or her work history." (Docket 16 at p. 12).  Plaintiff asserts these factors cut in her favor, "as she has a good work history, she takes strong pain medications, and her activities are

22

limited and sporadic." Id. at p. 13.  She also claims the ALJ did not explicitly consider her own testimony about her need to frequently lie down to manage her pain, but rather focused on Dr. L.'s opinion in this regard.  See id. at p. 13. Finally, plaintiff takes issue with the ALJ's determination that her statements about her symptoms are not entirely consistent with the medical evidence and rest of the record, noting both Mr. B. and Dr. L. believed her to be truthful in her account of her symptoms.  See id. at p. 13.

The Commissioner responds by asserting the ALJ considered claimant's statements against such other evidence as the objective medical evidence including examination findings and test results, plaintiff's daily activities, the treatment plaintiff received, plaintiff's alleged precipitating and aggravating factors and plaintiff's work history.  (Docket 20 at pp. 16-17).  The Commissioner asserts that in doing so, the "ALJ properly considered a number of relevant factors . . . in evaluating Plaintiff's symptoms," and "[s]ubstantial evidence supports the ALJ's findings." Id. at p. 19.

At her administrative hearing plaintiff testified a Function Report she had completed June 15, 2016, continued to accurately characterize her symptoms.  (Docket 9 ¶ 73).  In that report, plaintiff described daily pain that felt like "pins and needles." Id. ¶¶ 61, 63.  As she was no longer able to work at that time, she described her typical day as involving trying to do various chores around the house, such as laundry, cleaning the dishes, or caring for the dogs, but that she frequently had to take breaks to sit or lie down to relieve her pain. Id. ¶¶ 61-62, 64.  She noted waking up at least several times at night

and experiencing "unbelievable pain." Id. ¶ 63.  She was unable to do basic tasks, such as going to the store, for more than 20 or 30 minutes at a time.  Id. ¶ 65.

Her account of chronic, severe pain is consistent with medical records, which indicate she consistently reported pain ranging from levels of a 3 or 4 out of 10 to a 10 out of 10, beginning in early 2015 and all the way through 2018.  Throughout this time, records from essentially every medical professional plaintiff saw regarding her low back noted her experience with pain, including Dr. L., Dr. Lassegard, Dr. S., Dr. A., Dr. D. and physical therapist Mr. B.  See e.g., id. ¶¶ 12, 14, 16, 18, 20, 21, 24, 27, 30-32, 34-37, 39 & 41.  In particular, notes from her treating doctor, Dr. L., provide regular accounts of plaintiff's pain and even note that it increased over time.  Over the course of several years, Dr. L. continuously prescribed plaintiff various pain medications, pursued more aggressive treatments aimed at managing her pain, and on numerous occasions stated his opinion that she needed to frequently take measures like changing positions or lying down to alleviate her pain. Even Dr. Erickson and Dr. Rubinowitz acknowledged her pain and that it was "partially consistent with the medical evidence of record," although neither of these doctors ever themselves actually examined plaintiff, nor did they have access to what ultimately became the full medical record.  Id. ¶¶ 44-45. Objective diagnostic tests, such as MRI reports, noted findings that could account for plaintiff's symptoms.  See e.g., id. ¶ 15.

The overwhelming evidence on the record is consistent with plaintiff's testimony about her symptoms. The court finds the ALJ's determination therefore is not supported by substantial evidence. Indeed, the ALJ's declaration that plaintiff's "statements concerning the intensity, persistence and limiting effects of her symptoms are not *entirely* consistent with the medical evidence and other evidence in the record" sets the bar too high. (AR at p. 25) (emphasis added). There need not be complete corroboration between a claimant's medical records and her testimony. See Smith v. Schweiker, 728 F.2d 1158, 1163 (8th Cir. 1984) ("The ALJ may not disregard subjective evidence concerning pain merely because it was not fully corroborated by the objective evidence."). With plaintiff's diagnoses and based on the medical records identified above, the objective medical evidence supports the level of severity asserted by plaintiff.

### C. Plaintiff's Husband's Testimony

In "evaluating the intensity and persistence of [a claimant's] symptoms, [the ALJ] consider[s] all of the available evidence from . . . medical sources and nonmedical sources." 20 CFR § 404.1529(c)(1). This includes testimony from other people familiar with the claimant's situation, including, for example, family members. Id. § 404.1529(c)(3); see also SSR 16-3p.

Plaintiff's husband testified at her administrative hearing. (Docket 9 ¶ 74). The ALJ considered his testimony and concluded his "observations of the claimant's daily activities are not necessarily related to a medical diagnosis or functional limitation, and his proposed limitations on the claimant's abilities

are not necessarily supported by the objective medical evidence . . . ."  (AR at p. 27).  Plaintiff challenged this conclusion, arguing "the ALJ did not have any 'good reasons' to reject [the husband's] testimony."  (Docket 16 at p. 14).  In response, the Commissioner asserts the ALJ properly weighed plaintiff's husband's testimony relative to the other evidence and properly reached the conclusion his testimony was not persuasive or determinative.  (Docket 20 at p. 19).

Plaintiff's husband's testimony about plaintiff's typical daily routine and the impact of her pain and other symptoms on her ability to function closely resembles plaintiff's own testimony in this regard.  Plaintiff's husband indicated that, on an average day, plaintiff will try to complete chores such as laundry, housecleaning or taking care of the dogs but that she frequently must take breaks and sit or lie down to alleviate her pain.  (Docket 9 ¶¶ 75-76).  He testified that she is lying down or reclining "the majority of the day."  Id. ¶ 76. Just as there is ample support in the medical record for plaintiff's similar testimony on this topic, there is ample support in the medical record for her husband's.  The ALJ's cursory conclusion that the husband's testimony is not necessarily supported by the medical evidence is simply not supported by the substantial evidence in the record.

For the reasons given above, the court finds the ALJ did not perform a proper analysis of plaintiff's RFC at step four and her RFC assessment is not supported by substantial evidence.  42 U.S.C. § 405(g).  Remand to permit the ALJ to complete the step four analysis would normally be in order.  However,

because the opinions of Dr. L. are entitled to controlling weight, adopting Dr.
L.'s opinions and giving proper consideration to plaintiff's testimony regarding
her symptoms and plaintiff's husband's testimony regarding the same makes
remand at this point unnecessary.

**STEP FIVE**

At step five, the ALJ considers whether an individual can make an
adjustment to other work. 20 CFR § 404.1520(a)(4)(v).  The "burden of
production shifts to the Commissioner at step five." Stormo v. Barnhart,
377 F.3d 801, 806 (8th Cir. 2004).  Delane Hall, a vocational expert,
testified at plaintiff's hearing.  (Docket 9 ¶¶ 80-88).  In summary, Hall
testified:

1. Someone assessed with the RFC to perform light work could
   perform plaintiff's past positions of assistant manager and cashier.
   Id. ¶ 81.  However, if that person additionally could only speak in a
   whisper, Hall testified that person would not be able to perform the
   assistant manager and cashier positions.  Id. ¶ 82.  He testified the
   only jobs in the national economy that such a person could
   perform would be some unskilled, light occupations such as mail
   clerk, small parts assembler and agricultural sorter.  Id. ¶ 83.  If
   the individual needed to recline or lie down a significant portion of
   the day for pain relief—i.e., would be off task for 20 percent of an 8
   hour work day—Hall testified the person would not be able to
   perform even these unskilled positions in the national economy.
   Id. ¶ 84-85.  The individual would be unable to perform any work
   existing in significant numbers in the national or local economy.
   Id. ¶ 85.

2. Additionally, as for someone with the permanent work limitations
   Dr. L. imposed on plaintiff, see id. ¶ 58, Hall testified that person
   would not be able to perform plaintiff's past work, and "except for
   sedentary unskilled work, there would be no employment which
   exists in significant numbers in the national or local economy" for
   that person.  Id. ¶¶ 86-87.

27

In other words, given her impairments, plaintiff is not qualified for any work position, and there are no jobs available to her.

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing.  42 U.S.C. § 409(g).  If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate."  Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992).  Remand to the Commissioner is neither necessary nor appropriate in this case.  The Commissioner's own final witness, Delane Hall, compels resolving this case in favor of claimant.  Plaintiff is disabled and entitled to benefits.  Reversal is the appropriate remedy at this juncture.  Thompson, supra.

<strong>ORDER</strong>

For the reasons given above, it is

ORDERED that plaintiff's motion (Docket 16) is granted and the Commissioner's motion (Docket 19) is denied.

IT IS FURTHER ORDERED that the decision of the Commissioner of December 5, 2018, is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to the plaintiff.

Dated March 22, 2021.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE